Filed 3/6/26  In re Jaydan G. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re JAYDAN G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. ASHANTI G., Defendant and Appellant. | A174463 (City & County of San Francisco Super. Ct. Nos. JD24-3150, JD24-3150A) |

This is an appeal from the denial of the petition of Ashanti G., mother of two-year-old twins (mother) Jaydan G. and Kaydan G. (minors), to modify a juvenile court order ending reunification services and terminating her parental rights over minors based on alleged changed circumstances (Welf. & Inst. Code, §§ 388, 366.26).[1]  We affirm.

### FACTUAL AND PRCEDURAL BACKGROUND

On September 11, 2024, plaintiff, San Francisco Human Services Agency (agency), filed a juvenile petition pursuant to section 300,

---

[1] All statutory citations herein are to the Welfare and Institutions Code.

1

subdivisions (b)(1), (c), and (g), seeking to detain minors due to serious domestic violence involving mother in minors' presence, mother's substance abuse and mental health issues, and mother's inability to provide for their basic needs.

According to the detention report, a mandated reporting party reported on August 12, 2024, that mother's boyfriend of eight months had, in front of minors, punched mother on the shoulder, kicked her in the face, choked her, and threatened to kill her. When the police responded, they found minors and mother, but the boyfriend had fled. Mother needed medical attention and was taken to the hospital. An emergency protective order was issued, and a family safety plan was immediately developed with mother's support network. However, mother thereafter failed to follow up with the agency for several weeks. Mother missed scheduled meetings, and when the agency called her, she was evasive and angry with staff. The agency resorted to a police welfare check on August 23, 2024, during which the police found minors sleeping on a gym mat on the floor, as well as garbage and clutter strewn throughout the home. As a result, another child welfare referral was generated.

A second domestic violence incident was reported on September 7, 2024, despite the fact that mother was working with the agency to develop a family safety plan. After mother sought refuge at her godmother's house, she told the agency's program director, Ronda Johnson, that the boyfriend kicked her in the face. The police issued another emergency protective order protecting mother and minors from the boyfriend. Mother subsequently reported that, on September 7, the boyfriend appeared in her home using the back door and refused her demands to leave. Johnson advised mother that minors would be removed from her care. Johnson explained that while

mother was a young, single mother recently emancipated from extended foster care in 2022, mother required education and support regarding healthy relationships and protective parenting. The agency was also concerned that mother had untreated mental health issues and was using marijuana to manage them. Minors missed their 9- and 12-month child wellness medical exams and had not visited a doctor since they were six months old.

Minors were placed with a nonrelated, extended family member on September 9, 2024. At a detention hearing held three days later, mother appeared and submitted to the detention. The court ordered minors removed and ordered a minimum of six hours per week of supervised visitation for mother. Mother advised the court that the identity of the alleged father was unknown.

On October 24, 2024, the agency filed a disposition report recommending out-of-home placement. Mother had limited contact with the agency. While mother mostly refused to discuss the incidents giving rise to minors' removal, she acknowledged past incidents of domestic violence involving the boyfriend, including one wherein he once assaulted mother while she was holding one minor in her arms. Mother also acknowledged the boyfriend had assaulted other women, but she nonetheless engaged in a relationship with him, allowed him to be around minors, and let him back in her home after he assaulted her.

The agency also noted concerns about mother's parenting skills. Mother had neither childproofed her home nor taken responsibility for its safety. Mother placed food on the floor for minors to eat. She had no explanation for why minors were over six months behind on their medical appointments and vaccinations. Further, during supervised visitation, mother appeared preoccupied on her phone and took little interest in minors.

Once, one of the minors escaped the visit room while mother was on her phone, prompting a social worker to collect him. Another time, mother, after being told to put away her phone and engage with minors, left after 15 minutes of the visit. She did not say goodbye to minors. Further, on another visit, mother, again on her phone, failed to console minors, who were upset and crying.

The agency also reported mother was frequently angry and aggressive toward supervising staff. She would yell, scream, curse, walk out of meetings and visitation, or hang up the phone when told something she did not like. Mother also reported regular marijuana use, which concerned the social worker since mother was minors' sole caregiver.

At the jurisdiction/disposition hearing on December 4, 2024, mother submitted to a first amended petition.[2] The court then declared minors dependents and ordered out-of-home placement, finding reasonable efforts were made to prevent the need for removal. The court also ordered mother to participate in reunification services for domestic violence, parenting education, individual therapy, substance abuse assessment, and drug testing. A six-month review hearing was scheduled for May 13, 2025.

On April 24, 2025, the agency filed a status review report recommending termination of mother's reunification services. Mother remained in a relationship with her violent boyfriend. Since removal, the police had been called to her residence for domestic violence six times between October 27, 2024, and March 16, 2025. Additionally, mother reported a domestic violence incident occurring on March 16, 2025, wherein

_____

[2] A first amended petition was filed on December 4, 2024, which omitted the allegation in the original petition of serious emotional damage under section 300, subdivision (c), among other minor amendments not relevant on appeal.

4

mother retrieved two knives to defend herself. When the police arrived, the boyfriend reported that mother was trying to kill him. Both mother and the boyfriend were arrested for domestic violence. During the same time period, mother failed to engage after being referred for domestic violence services and refused to go to a domestic violence shelter despite fearing for her life. Mother also expressed no interest in receiving services to improve her parenting skills or engaging in therapy.

Further, mother continued to display erratic, irritable, and aggressive behavior toward the staff involved in her case, especially when she disagreed with an instruction or request. On one occasion, mother called a social worker 19 consecutive times. When the social worker, who was in court, was unable to respond on her cell phone, mother sent her a threatening, expletive-ridden text message. Mother routinely became enraged during visits, yelling at the supervising staff and leaving without telling minors goodbye. She also regularly became irritated with minors and appeared unable to supervise both of them at the same time. A visit to mother's home revealed unsafe conditions and an absence of food. During another visit, the case manager for a parenting program found two magazines of bullets in a kitchen drawer.

Mother was assessed for substance abuse, with no treatment recommended. However, the agency remained concerned about mother's habitual marijuana use as the sole caregiver to minors.

Minors continued their placement with the "Maternal Great God Mother," who was committed to adoption should reunification fail. Minors, who had been diagnosed with autism spectrum disorder and developmental delays, needed additional support around their sleeping, daily routines, and interactions with peers.

An addendum report filed on May 22, 2025, noted that during a recent visit, mother, for the first time, sat down to color with minors and was able to nurture them when they cried.  However, as recently as May 19, 2025, mother told a social worker that she did not see the benefit of services and would not discuss domestic violence.

A contested six-month review hearing was held on May 27, 2025.  The agency concluded mother had made "limited to no progress" in addressing the concerns that brought about the dependency.  It recommended terminating reunification services and selecting adoption as minors' permanent plan.  Following the hearing, the court agreed with the agency and, thus, terminated mother's reunification services, reduced her visits to twice per month, and scheduled a section 366.26 hearing.

A report filed in anticipation of the section 366.26 hearing noted the agency remained concerned about the quality of mother's visits with minors.  Mother continued to exhibit negative and irritable behavior toward staff at the visits and in front of minors, prompting the service provider to inform the agency that it would no longer supervise mother's visits.  As such, the agency stepped in to oversee mother's visits.

The agency also reported that although minors knew mother and engaged in play with her, they did not rely on her for safety or emotional regulation to the same degree they did with their caregiver.  The agency concluded minors were likely to be adopted within a reasonable time and that adoption would meet their need for legal, physical, and emotional permanency.  Moreover, the caregiver, with whom minors had lived since September 9, 2024, successfully completed the resource family approval process.  She was committed to adopting minors, understood their diagnoses

6

and needs, and believed she could provide them with the "love and stability they deserve."

On September 2, 2025, mother filed a section 388 petition requesting reinstatement of reunification services on the grounds that her circumstances had changed since services were terminated.  In support of her petition, mother offered a July 16, 2025, letter from Sister's Circle Women's Support Network (Sister's Circle) and several negative drug test results.  On September 17, 2025, the court ordered a combined evidentiary hearing on mother's section 388 petition and the agency's permanent plan recommendation.

A combined hearing under sections 388 and 366.26 was held on September 24, 2025.  Mother, in support of her petition, testified that, since July 2025, she had participated with Sister's Circle, which provided domestic violence support, women's recovery services, parenting classes, and weekly random drug testing.  She attended Sister's Circle Monday through Thursday from 10:00 a.m. to 2:00 p.m.  She also attended weekly therapy addressing domestic violence, anxiety, and depression.  Mother drug tested weekly and was beginning to understand her need to "stop smoking weed," since using marijuana was "not more important than [her] children."

Mother further testified that she was enrolled in weekly parenting classes and had completed 10 classes.  There, she was learning skills for responding to minors' needs and comforting them when they were upset.  Mother understood she "messed up" by exposing minors to domestic violence and not paying them enough attention.

Mother acknowledged that she last used marijuana on her birthday, September 10, 2025.  Mother had not spoken with the social worker and did

not wish to do so, but she would if services were reinstated. She was requesting six more months of services.

The juvenile court denied mother's section 388 petition, finding that while mother's circumstances were "changing" for the better, they had not yet "changed" to the extent required for minors to safely return to her care. As such, the court found that awarding mother further services at this late juncture would not be in minors' best interests.

The court then turned to the section 366.26 hearing. Cullen Ruiz, the social worker assigned to the case since June 2025, testified that mother was engaging in regular supervised visits twice monthly for three hours, with few recent negative interactions with staff. The agency was supervising the family's visits due to earlier incidents of mother's irritable outbursts toward the staff of the previous supervising organization. Minors responded positively to mother during visits and recognized her. However, according to Ruiz, minors did not have a "strong bond" with mother and had not relied on her for their needs for "quite some time . . . ." Minors' caregiver, with whom they had lived since September 7, 2024, was willing to adopt them and was a strong advocate for their autism-related needs. Ruiz opined that terminating parental rights and setting adoption as the permanent plan were in minors' best interests.

After the hearing, the court found, by clear and convincing evidence, that minors were adoptable and terminated parental rights. Mother then timely appealed the court's denial of her section 388 petition.

## DISCUSSION

Mother contends the juvenile court applied the wrong legal standard in denying her petition under section 388 for reinstatement of reunification services. As such, mother contends the court's denial, as well as its

8

subsequent findings and order terminating parental rights pursuant to section 366.26, must be reversed. We disagree.

Section 388 permits a parent to petition the juvenile court to modify or set aside a prior court order by demonstrating: (1) a change of circumstances has occurred and (2) the requested modification is in the child's best interests. (§ 388, subd. (a); *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) "[T]he thrust of the legislative scheme is to encourage parents to correct earlier problems so as to reunite them with their children." (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1086.) Section 388 thus offers parents an " 'escape mechanism' " from a flawed order relating to the parent–child relationship that is "vital to the constitutionality of the dependency scheme . . . ." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528, italics omitted.)

On appeal, we review an order denying a parent's petition under section 388 for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) It is an abuse of discretion for the juvenile court to misapply governing law. (*Doe 2 v. Superior Court* (2005) 132 Cal.App.4th 1504, 1517.)

Here, we find no abuse of discretion. In considering whether a parent has made the necessary showing under section 388, "the juvenile court may consider the entire factual and procedural history of the case," including "factors such as the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 616 (*Mickel O.*).)

The juvenile court met this standard. After hearing mother's testimony and argument from counsel, the court summarized the facts of the case and

9

commended mother for her recent progress, stating that her positive actions "take[] courage." Nonetheless, the court denied the petition, finding that mother's recent engagement with Sister's Circle and focus on therapy and limiting her marijuana use constituted "changing" circumstances, not changed circumstances, for the purposes of section 388. In particular, the court noted that mother admitted she continued to use THC and was unwilling to speak or engage with Social Worker Ruiz. She also failed to provide proof of negative drug tests for September and August or information from providers corroborating her testimony. And, the court noted, it had only been a few months since she interacted with her abusive former boyfriend. Thus, based on the record as a whole, the court found that reinstating mother's services would not be in minors' best interests because it would not promote their need for permanency and stability, particularly in light of their autism diagnoses and developmental delays.

The juvenile court's analysis and conclusions were well reasoned and soundly based on evidence in the record. Accordingly, there is no basis for finding the court abused its discretion in denying mother's section 388 petition. (*In re Stephanie M., supra*, 7 Cal.4th at p. 318 [juvenile court's ruling should not be disturbed unless it is "clearly established" that the court " ' "exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination" ' "].)

In so holding, we reject mother's claim that the court misapplied the statutory framework by "requir[ing] fully changed circumstances, discount[ing] recent improvement as insufficient as a matter of law, and appl[ying] this mistaken view to both prongs of the analysis." To begin, mother's argument disregards fundamental rules of appellate law: We presume the juvenile court's ruling is correct, and we resolve all conflicts in

10

favor of the ruling and indulge all legitimate inferences to uphold the court's determinations. (*In re K.S.* (2016) 244 Cal.App.4th 327, 337.) Under this lens, the court did none of the things mother claims. Indeed, as the court acknowledged at the hearing, "[its] goal was to promote the children's best interests, which at this point were *permanency and stability . . . .*" (*Mickel O., supra*, 197 Cal.App.4th at p. 617; see § 388 subd. (a).) The court did just that. Mother's lingering issues with using marijuana, her unwillingness to cooperate with the agency in its efforts to provide her services, and her just recent separation from an abusive former boyfriend supported the court's determination that minors' adoption by a loving and capable caregiver attentive to their special needs would best promote their primary interests in permanency and stability.

## DISPOSITION

The juvenile court's findings and order of September 24, 2025, are affirmed.

Jackson, P. J.

WE CONCUR:

Simons, J.
Burns, J.

A174463/*S.F. Human Services Agency v. Ashanti G.*